The Charterers/the Owners to have the option to replenish bunkers for their own account prior to delivery/redelivery provided not interfering with the Vessel's operations. Time lost for replenishment of bunkers, if any, before delivery/redelivery to be for the Charterers'/the Owners' account respectively.

Clause 68 CONSECUTIVE OFF-HIRE:

Should the Vessel be off-hire for a period more than sixty (60) consecutive days, the Charterers shall have the option to cancel the balance period of this Charter by giving notice to the Owners without prejudice to any other right whatsoever the Charterers may have under this Charter. The Charterers have the option of adding all or any part of off-hire period except for maximum seven (7) days for each periodical drydock calculated by deviation basis as set out in Clause 69 to the charter period as agreed in line 14-15 by giving notice to the Owners at least two (2) months before expiration of the original period.

Clause 69 DRY DOCKING:

The Owners shall have the option to place the vessel into dry dock during the currency of this charter at intervals of every about 24-30 months at a convenient time and place to be mutually agreed between Owners and Charterers for bottom cleaning and painting and/or repairs as required by Class or directed by circumstances. The Owners shall give the Charterers three (3) months prior notice of three (3) month-period, of intended scheduled dry dock, unless such dry dock is an emergency. Charterers shall assist Owners best possible to bring the Vessel back to Japan/Singapore range for such dry-docking.

The off-hire period shall be the balance period between the actual time elapsed (last discharge port - dock - first nominated port) and the estimated time required under the artificial voyage going straight from the last discharge port to first nominated port. The bunkers consumed to be calculated in the same manner, unless otherwise mutually agreed.

Clause 70 DOUBLE BANKING:

The Charterers to have the right to load and/or discharge up to full cargo on open sea on direct transshipment to/from trawlers or other vessels including factory ships. (The Charterers to arrange for sufficient fenders on board of the feeding ship in order to prevent damages). The Charterers to give the Owners prior notice of such double banking.

Should weather circumstances or heavy sea during loading operation hinder transshipment operation or endanger the safety of the Vessels, the Master may leave the feeding ships respectively instruct the feeding ships to leave from alongside until the weather/sea conditions have improved.

In case of discharging operation, feeding the Vessel means receiving the Vessel.

Any additional insurance premium caused by the ship to ship loading to be for the Charterers' account. The work which the Crew is to do is to rig and unrig loading gear, moor and unmoor, open and close

hatches, except stevedoring and tallying to be performed by the Charterers.

Clause 71

Delete

Clause 72 OPTION TO CHANGE NAME:

The Charterers to have the option to change the Vessel's name at maximum of two (2) times during the Charter period. The Owners' prior consent is to be obtainable concerning the actual name to be used and the approval of which shall not be unreasonably withheld. All cost including the Owners' administrative expenses at US$6,000.- each time for the change of names to be for the Charterers' account and in their time.

Clause 73 PURCHASE OPTION:

(A) The Charterers shall have the option to purchase the Vessel at the end of the 7th year of charter and again at the end of the 10th year. The purchase price shall be USD 47 million at the end of the 7th year and USD 41.5 million at the end of 10th year.

The options shall be exercised with minimum six (6) months prior notice in advance, but the notice of more than twelve (12) months in advance will not be accepted by the Owners.

The Purchase option prices hereinabove is subject to adjustment, when the USD/J. Yen exchange rate falls outside the Yen 95 / Yen 115 per USD on the date of Charterers confirming their purchase.

In case falling outside this fairway, prices to be adjusted as follows.

X=Exchange Rate
Y=Purchase Option Price

    a) When Yen is stronger than Yen 95 / Dollar,
       Actual price after adjustment = 95 Y/X
    b) When Yen is weaker than Yen 115 / Dollar
       Actual price after adjustment = 115 Y/X

(B) In the event that the Owners choose to continue further charter employment of the vessel or to sell the vessel, the Owners to advise the Charterers of their intention in writing not later than four (4) months prior to earliest day of expiration of this charter and such exclusive negotiations shall be made in usual manner between the parties. However should the parties be unable to reach agreement not later than three (3) months prior to the earliest day of expiration of this charter, the Owners have liberty to fix alternative employment with any third party.

Clause 74 SECRECY:

This Charter Party and its details to remain private and confidential.

Clause 75 JOINT ON / OFF HIRE SURVEY

Joint on/off hire survey to be carried out on delivery and redelivery to ascertain the Vessel's condition and bunkers quantity ROB on delivery/redelivery and is to be performed by one surveyor acceptable to the both parties.
Time for on-hire survey is to be for the Owners' account and time for off-hire survey to be for the Charterers' account but costs to be equally shared between both parties.

Clause 76 REPLENISHMENT OF BUNKERS:

Replenishment of bunkers is arranged and paid for by the Charterers but always under the supervision and responsibility of the Master. The Master shall pay due diligence for replenishment of bunkers so as not to cause oil spillage while bunkering.

The Charterers shall make best endeavours to supply to the Vessel (as if the Vessel is running for their own account), with IFO CST ISO SPECIFICATION RMG35 throughout the currency of this Charter Party.

Clause 77:

Delete

Clause 78 HOLD CONDITION ON REDELIVERY:

The Vessel shall be redelivered by the Charterers to the Owners with clean swept hold washed down and dried up free from residue and odour of previous cargo.
However, the Charterers may redeliver the Vessel with holds as are discharged and left by stevedores, in consideration of which the Charterers to pay lumpsum compensation of US$3,000 to the Owners.

Clause 79 LIVESTOCK:

The Vessel is not to be employed in carriage of live stock but if so required by the Charterers on ad hoc basis, compliance will not be unreasonably withheld and will be treated case by case on its merits.

Provided always that:

A letter of Indemnity will be issued by the Charterers in the Owners' favour as per wording set forth herebelow:

"In consideration of your agreeing to allow the Vessel to carry Live Stock from _____ to _____, and subject to the following conditions : -

Availability of accommodation for attendants:
Attendants to perform all tasks without relying on the Crew's assistance:
Sufficiency of fresh water on board to meet the necessity:
Treatment of soils without violating any port quarantine regulations:

We hereby undertake the following obligations: -
The Live Stock, which is to be limited to five (5) heads, will only be shipped on weather deck side starboard side and will be at the Charterers' risk with all fittings and other requirements to be for their account.
Cleaning of decks enroute following unloading:
To hold the Owners harmless under any circumstance but not limited to time loss due to restriction by Quarantine Authorities, consequences of epidemic fouling of the ship's Sanitary Certificate and damage or contamination to cargo carried on board simultaneously and/or subsequently.

Clause 80 TRADING LIMITS / BREAKING IWL:

Trading worldwide via safe ports/berths/anchorages always afloat always within IWL, excluding Israel, North Korea, Cuba, and any other area or country banned and/or boycotted and/or embargoed and/or sanctioned by UN and/or war or war like zones.

Any NAABSA port shall not be granted.

Should the political, social or economical situation change in any of the excluded countries/areas to the extent that the normal trading of the vessel is no longer affected, then the Charterers shall be allowed to trade the vessels to such previously excluded country, through mutual agreement.

Should the political, social or economical situation in a country or area where the vessel is allowed to trade deteriorate as to affect the normal trading of the vessel such country/area shall be excluded through mutual agreement.

Any revision of trading limits shall always be subject to the approval of the Owners' P&I Club.

If the Charterers wish to trade outside Institute Warranty Limits, they can break I.W.L. and undertake to bear all additional costs and expenses, including arranging at their expense such extra insurance cover that is required. However Charterers and Owners agree that costs and expenses for the navigation in ice shall be settled in accordance with Clause 97. The Charterers shall be entitled to have the benefit of any discounts received by the Owners for such extra insurance.

The Charterers to notify not only the Master but also the Owners enabling the Owners to arrange extra insurance cover for breaking I.W.L. in any event the Vessel not to trade to areas where the Vessel's Hull Underwriters do not undertake the coverage. However Charterers and Owners agree that arrangement of extra insurance cover for the navigation in ice shall be settled in accordance with Clause 97.

Clause 81 GOVERNING LAW / CHANGE IN APPLICABLE LAWS REGULATIONS:

This Charter Party and any disputes arising hereunder shall be governed by and construed in accordance with English law both as regards substance and procedure.

During currency of this charter, if the following circumstances affect performance by Owners of this charter, Charterers and Owners shall discuss and agree through sincere discussion in good faith in order to resolve ;

(i) When existing laws and regulations which apply to this charter contract is changed or revised by relevant authorities.

(ii) When any laws and regulations come into force.

Clause 82 :

Delete

Clause 83 OIL POLLUTION:

1) The Owners warrant that throughout the currency of this Charter they will provide the Vessel with the following certificates:

   Certificate issued pursuant to Section 1016 (a) of the Oil Pollution Act 1900, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the Vessel into the Charter or, it later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

2) Notwithstanding anything whether printed or typed herein to the contrary:
   a) Save as required for compliance with paragraph (1) hereof, the Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.
   b) The Charterers shall indemnify the Owners and hold then harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the Vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which the Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.
   c) The Owners shall not be liable for any loss, damage liability or expense whatsoever and howsoever arising which the Charterers and/or the holders of any Bill of Lading issued

